

**Dated: June 09, 2021.**

**TONY M. DAVIS**
**UNITED STATES BANKRUPTCY JUDGE**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 17-11543-tmd |
| | § | |
| CHAMPION PRINTING & | § | |
| COPYING, LLC fdba Jerry Hayes | § | |
| Photography | § | |
| | § | |
| DEBTOR | § | CHAPTER 7 |

| | | |
|---|---|---|
| John Patrick Lowe, | § | |
|     *Plaintiff* | § | |
| | § | |
| v. | § | ADVERSARY NO.  19-01052-tmd |
| | § | |
| Gregg E. Phillips, Jerry D. Hayes, Jake's | § | |
| Printing, LLC dba Jerry Hayes Photography, | § | |
| William B. Gammon, and Gammon Law | § | |
| Office | § | |
|     *Defendants* | § | |

## <u>PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

**TO THE HONORABLE U.S. DISTRICT COURT JUDGE:**

The U.S. Bankruptcy Court for the Western District of Texas, Austin Division

(Bankruptcy Judge Tony M. Davis), submits the following Proposed Findings of Fact and

Conclusions of Law ("Proposed Findings and Conclusions") to the U.S. District Court for the

Western District of Texas, Austin Division ("District Court") for consideration and review, in

accordance with 28 U.S.C. § 157(c)(1) and Rule 9033 of the Federal Rules of Bankruptcy

Procedure ("Bankruptcy Rules").

This is a malpractice suit filed by the Trustee for the corporate debtor, Champion, against

lawyer Bill Gammon and his law firm, Gammon Law Office, for his actions in filing a restraint

of trade lawsuit in state court on behalf of Champion. Because this malpractice suit is not a

"core" proceeding as described in 28 U.S.C. § 157 (b)(2), and because not all parties here were

willing to consent to the entry of a final judgment by this Court, this Court is limited to providing

these Proposed Findings and Conclusions to the District Court.

## I.  **Proposed Findings of Fact**

### A.  **Cast of Characters**

1.      Champion Printing & Copying was a company co-owned by Jerry Hayes and

Greg Phillips. Joint Pre-Trial Order, 10, ECF No. 90. At least since 2014, Hayes worked under

Champion's name as a high-end wedding photographer and was primarily retained by wedding

vendors like florists and venues to photograph their work at private weddings. *Id.*; Trial Tr.

27:22-24.

2.      Jennifer Nichols and Jennifer Lindberg are also wedding photographers, but they

typically contract with the bride and groom or their families to photograph the entire wedding.

Joint Pre-Trial Order, 10, ECF No. 90.; Trial Tr. 27:13-19.

3.      Following disputes between Hayes and Nichols, and between Hayes and

Lindberg, Hayes retained Defendants Bill Gammon and Gammon Law Office, PLLC to represent Champion in a state court suit against Nichols and Lindberg. Joint Pre-Trial Order, 10, ECF No. 90. In this state court suit, Champion pleaded theories based on restraint of trade and tortious interference. Pl.'s Ex. 3.

4.      The state trial court granted summary judgment for Nichols and Lindberg on all of Champion's claims, including the restraint of trade theories, and awarded Nichols and Lindberg sanctions for $41,518.75 against Champion. Joint Pre-Trial Order, 11, ECF No. 90. On appeal and cross-appeal, the state court of appeals affirmed the sanctions and the summary judgment. *Id.* The Texas Supreme Court denied review. *Id.*

5.      Champion then filed for bankruptcy and John P. Lowe was appointed Trustee. *Id.* at 9.  Lindberg and Nichols each filed a proof of claim in the bankruptcy case for the amount of the sanctions award and were the only two creditors in the case. *Id.* at 11.; Trial Tr. 18:21-25.

6.      After his appointment, the Trustee filed this adversary proceeding alleging, among other things, that Gammon Law Office and Bill Gammon individually were liable to Champion for malpractice. *Id.* at 12:15-16. Compl., 18-19, ECF No. 1. The Trustee alleged damages in the amount of the court-ordered sanctions along with the amounts Champion paid to Gammon Law Office to pursue the suit. *Id.* at 20.

**B.  Hayes' Dispute with Lindberg**

7.      In December 2013, Hayes was hired by wedding vendor Townsley Events to photograph its decor at a wedding the following summer. Pl.'s Ex. 1, at 6; Defs.' Ex. 5A, at 2. The bride and groom's family hired Lindberg to photograph the same wedding. Defs.' Ex. 5A, at 1. The record does not indicate which contract came first.

8.      Before the wedding, Townsley reached out to Lindberg by email to advise that

she had hired Hayes as a vendor photographer for the upcoming wedding. Defs.' Ex. 5A, at 2.

Lindberg replied that, because of an exclusive photographer clause in her contract with the bride

and groom, no other photographers could be present at the wedding. *Id*. at 1; Trial Tr. 33:8-13.

Lindberg explained various reasons for enforcing her exclusive photographer clause, including

client privacy and product quality. *Id.*; Trial Tr. 34:7-22. Townsley forwarded this email

exchange to Hayes, who forwarded it to Gammon. Defs.' Ex. 5A, at 3. Following these

conversations, Townsley Events terminated its contract with Hayes and Champion. Pl.'s Ex. 1, at

6.

### C.  **Hayes' Dispute with Nichols**

9.        During this same time, Hayes was involved in a similar dispute with another local

photographer, Jennifer Nichols.

10.       On March 25, 2014, Hayes and wedding florist Abby Daigle signed a contract for

Hayes to photograph Daigle's floral arrangements during a wedding the next month. Pl.'s Ex. 1,

at 5. The wedding party retained Nichols as the photographer, but the record does not indicate

which contract came first. Def. Ex. 4:1. A month before the wedding, Daigle emailed Nichols to

advise that Hayes would be photographing for her and other vendors. Defs.' Ex. 4:1. Nichols

responded and advised Daigle that, as the "exclusive contracted photographers" for the wedding,

Nichols would provide Daigle with images at no charge and that vendor photographers like

Hayes would not be allowed. Def. Ex. 4(3/27):1;8-9; Trial Tr. 40: 12-21. Following a long email

exchange between Nichols and Daigle, Daigle terminated her contract with Hayes and

Champion. Defs.' Ex. 4(3/27):8. Daigle forwarded the emails between herself and Nichols to

Hayes, who sent them to Gammon. Defs.' Ex. 4(3/28):6.

### D.  **Developing the State Court Lawsuit**

11.     Because of these disputes, in April 2014 Jerry Hayes contacted Gammon Law Office about representing Champion in a lawsuit against Nichols and Lindberg. Joint Pre-Trial Order, 10, ECF No. 90. When drafting the lawsuit, Gammon had four primary sources of information from which to draw upon: First, the details of the disputes between Hayes, Nichols, and Lindberg, including the emails described above; Second, letters solicited from various wedding vendors and later, a meeting held at Gammon's office; Third, a letter from the potential defendant's attorney, Craig Barker; and Fourth, Hayes himself.

12.     First, Gammon had the details of the disputes based on the email exchanges that were forwarded to him, described above.

13.     Second, Gammon had insight gained from vendor letters and interviews. In crafting the lawsuit, Gammon solicited letters from wedding vendors in support of Hayes. Defs.' Ex. 13; Defs.' Ex. 23, at 3. In the letters, dated between April and May 2014, two wedding photographers said they were able to work in harmony with Hayes acting as a vendor photographer at weddings where they were hired by the bridal party. Defs.' Ex. 13. Other letters from a variety of vendors, from event planners to ice sculptors, shared their appreciation of Hayes' work and the value of his photographs to their businesses. *Id*. Gammon had the information from the vendor letters available to him before filing the first petition in June 2014. *Id.*; Joint Pre-Trial Order, 10, ECF No. 90. After filing the first and second petitions, Gammon also held a meeting of about two dozen vendors at his office. Trial Tr. 73:4-6; 117:16-19; Defs.' Ex. 22, at 3. He testified that the interviews at this meeting confirmed his tortious interference theories. Trial Tr. 73:1-11. The third and final petition was filed after this meeting.  Pl.'s Ex. 3, at 16.

14.     The third piece of information available to Gammon was a cease and desist letter

sent to him by attorney Craig Barker that informed Gammon of the possible causes of action

Lindberg had against Hayes and requested that Hayes "cease interfering with Ms. Lindberg's

existing contracts and contractual relations and prospective relations." Defs.' Ex. 8, at 4. In the

letter, Barker explained the purpose of the exclusive photographer clause, listed the elements for

both tortious interference with existing contracts and tortious interference with prospective

relations, and briefly outlined Lindberg's potential case against Hayes. Defs.' Ex. 8.

15.    Finally, Gammon had access to Hayes, his client, and his knowledge of the

disputes and the Austin wedding market. Gammon testified that he corresponded with Hayes by

email. Trial Tr. 117:12-15. Emails in evidence show that Gammon was also copied on or

forwarded emails between Hayes and Tony Read, Gammon's associate. Pl.'s Ex. 33. In one

email forwarded to Gammon, Read and Hayes discuss the size of the Austin market. And at the

malpractice trial, Hayes testified that Lindberg and Nichols did not control either the

international or the local Austin wedding photography market. Trial *Id.* at 9-10; Tr. 49:18-22.

The size of the market, and the issue of control are both relevant to the restraint of trade theories.

Emails and testimony establish that Hayes was an active client and that this knowledge about the

disputes and the market was available to Gammon before filing suit. Trial Tr. 116:5-11; 117:12-

15. *See generally* Pl.'s Ex. 33.

### E.  <u>What Happened in State Court</u>

16.    On June 4, 2014, Champion sued Nichols and Lindberg. Pl.'s Ex. 1. In the Second

Amended Petition, the live pleading when the state court granted summary judgment, the

Gammon Defendants made four relevant allegations on behalf of Champion. Pl.'s Ex. 3. They

alleged conspiracy to restrain trade under TEX. BUS. & COMMERCE CODE § 15.05 (a) and (c),

tortious interference with existing contracts, and tortious interference with prospective relations.

6

*Id*. Nichols and Lindberg answered and counterclaimed against Champion, ultimately obtaining a summary judgment dismissing all Champion's causes of action. Joint Pre-Trial Order, 11, ECF No. 90.

17.     Nichols and Lindberg then filed a motion for sanctions against Champion, Hayes, attorneys Gammon and Read, and Gammon Law Office. Pl.'s Ex. 9, at 1; Trial Tr. 18:1-3. The court sanctioned Champion but did not sanction its counsel. Pl.'s Ex. 15, at 1. The trial court found that under Texas Civil Practice and Remedies Code Chapter 10 and Texas Rule of Civil Procedure 13, sanctions were appropriate for numerous reasons, including that Champion "knew or should have known that it was groundless to assert that…two local photographers, control [the] worldwide high-end wedding industry about which he pled…." *Id*. at 2. That court also found that Hayes's online comments about the lawsuit were evidence of bad faith and improper purpose in filing suit. *Id*. As a result, Champion—but not the Gammon Defendants—was ordered to pay attorney's fees to Nichols and Lindberg totaling $41,518.75. *Id.* at 1; Trial Tr 18:21-25.

18.     Champion appealed both the summary judgment ruling in favor of Nichols and Lindberg and the sanctions award. Pl.'s Ex. 23, at 12. In the appeal from the summary judgment, Champion argued that the trial court erred in two ways. First, Champion argued that granting summary judgment was "an improper method of challenging deficiencies in pleadings" and instead, special exceptions should have been used. *Id.* at 22. Second, Champion argued that granting summary judgment was improper because it raised genuine issues of material fact. *Id.* In affirming the summary judgment, the appellate court found that the claims could not have been cured by amending the pleadings because the facts could not support an antitrust claim and because the tortious interference claims either relied on the failed antitrust claims or were subject to the defense of justification. *Id.* at 25.

7

19.     The appellate court also reviewed and upheld the imposition of sanctions, finding that the trial court did not abuse its discretion when it found that Champion, "(1) made groundless assertions of facts, and (2) brought the lawsuit for improper purposes…," and thus sanctions against Champion were proper under Chapter 10 of the Texas Civil Practice and Remedies Code.[1] Pl.'s Ex. 23, at 20. Specifically, the appellate court found that the assertion of a restraint-of-trade cause of action, an antitrust claim, lacked evidentiary support and so imposing sanctions was proper under Chapter 10. *Id.* at 19-20. The appellate court based its finding on the fact that Champion knew "Nichols and Lindberg did not control a significant market share of the international (or, in fact, local) wedding industry and that an antitrust cause of action based on this fact situation was groundless." *Id*. at 20.

### F.  Bankruptcy Proceedings

20.     After Champion's petition for review of the appellate court decision was denied by the Texas Supreme Court, Champion filed for bankruptcy. Joint Pre-Trial Order, 11, ECF No. 90. Nichols and Lindberg filed proofs of claim based on the sanctions award in the bankruptcy case. *Id.* The Trustee then filed this adversary proceeding against co-owners of Champion, Phillips and Hayes, and attorney Bill Gammon and Gammon Law Office. *Id.* at 12. After mediation, Hayes, Phillips, and another entity settled with the Trustee and were released from the case. ECF No. 100. On motion by Gammon and Gammon Law Office, all claims except legal malpractice were dismissed against them. ECF No. 29. Following an amended complaint, Gammon and Gammon Law Office filed a motion for summary judgment, as did Nichols and Lindberg. ECF Nos. 55; 62. Both motions were denied, and the issue of malpractice was tried.

---

[1] In their cross-appeal, Nichols and Lindberg argued that the trial court erred in not imposing sanctions on Champion's attorneys and by not holding Champion's attorneys jointly and severally liable. But the appellate court refused to address this issue because Nichols and Lindberg did not object to the sanctions order at the trial level and so the error was not preserved. Pl.'s Ex. 23, at 10.

ECF Nos. 76; 77. At trial, Gammon testified that he was "responsible for the pleadings that came out of the law office at that time" and that "ultimately, the buck stops here," assuming at least some responsibility for the state court suit. Trial Tr. 69:16-19. Because only Gammon, and not Gammon Law Office, can directly commit malpractice, the rest of these findings and conclusions will focus on Bill Gammon.[2]

## II. Proposed Conclusions of Law

### A. Opposing theories of the case

21.     Under Gammon's theory of the case, to evaluate the Trustee's claim – that the lawsuit was groundless and never should have been filed – we need to see what Gammon knew or should have known based on the facts and the law when the case was filed to determine whether a reasonably prudent attorney could have made the same decision. Defs.' Post-Trial Br.1-3, ECF No. 110. The Trustee and his expert have taken a different approach; they assert that the analysis is 20-20 hindsight. The Trustee urges the Court to adopt the opinions of the state trial and appellate courts as the "law of the case," which found that the pleadings were groundless. Pl.'s Post-Trial Br. 5, ECF No. 106; Pl.'s Post-Trial Reply 2, ECF No. 111. He argues that those state court findings compel a finding of malpractice here. Post-Trial Reply 6-7, ECF No. 111. For the reasons described below, the Court adopts Gammon's theory and will only consider facts that could have reasonably been known to Gammon when the case was filed.

### B. Law of the Case

22.     The Trustee argues that the state court findings are "law of the case" that this

---

[2] The Ohio Supreme Court found in *Nat'l Union Fire Ins. Co. v. Wuerth* that only individuals practiced law and thus a law firm could not directly commit malpractice. Thus, a law firm could only be held vicariously liable for malpractice when a principal or associate was also liable. 122 Ohio St. 3d 594 (2009)(finding there was no claim for malpractice against a firm when the claims against relevant principals and employees were either dismissed or never pleaded). While this case is merely persuasive, the same logic applies here. For this reason, findings and conclusions about malpractice, other than liability for damages, apply only to Gammon individually.

Court cannot second-guess. If the Trustee is correct, then what happened in state court controls the outcome here.

23.     "The law of the case doctrine provides that a decision of a factual or legal issue by an appellate court establishes the law of the case and must be followed in all subsequent proceedings in the same case in the trial court." *Lyons v. Fisher*, 888 F.2d 1071, 1074 (5th Cir. 1989)(internal quotations omitted); *See also Briscoe v. Goodmark Corp.*, 102 S.W.3d 714, 716 (Tex. 2003)(law of the case requires that questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent stages).

24.     As alluded to above, the Trustee has argued here that the state appellate court opinion is the "law of the case" and is outcome determinative in this proceeding. But the proceedings in state court and the proceedings here are two different cases. The subject matter is different. In the state court, the claims at issue were antitrust and tort claims, but here the issue is negligence in the context of malpractice. The parties are also different. In the state court, Champion sued Nichols and Lindberg, while here the Trustee, on behalf of Champion, is suing the Gammon Defendants. Because these are two different cases, the "law of the case" does not apply. § 4478 Law of the Case, 18B Fed. Prac. & Proc. Juris. § 4478 (2d ed.); *In re W.R. Grace & Co.*, 591 F.3d 164, 174 (3rd Cir. 2009) (bankruptcy court did not apply law of the case doctrine when state court suit did not involve the same parties and issues).

### C.  <u>Malpractice</u>

25.     Under Texas law, a lawsuit for legal malpractice is based on negligence. *Cosgrove v. Grimes*, 774 S.W.2d 662, 664 (Tex. 1989) (citations omitted). An action for negligence is based on four elements: a duty owed, a breach of that duty, proximate cause, and damages. *Id.* at 665 (citing *McKinley v. Stripling*, 763 S.W.2d 407 (Tex. 1989)). In evaluating

10

breach, a lawyer's conduct is compared to that of a reasonably prudent attorney, evaluated in light of the information the lawyer had at the time. *Cosgrove*, 774 S.W.2d at 664. "If an attorney makes a decision which a reasonably prudent attorney *could* make in the same or similar circumstance, it is not an act of negligence even if the result is undesirable." *Id.* at 665 (emphasis in original). In analyzing the issue of malpractice here, the Court will only consider facts that were known or could have been known to Gammon when the lawsuit was filed.[3]

26.      Causation in a legal malpractice case "may be beyond the jury's common understanding and require expert testimony." *Alexander v. Turtur & Assocs.*, 146 S.W.3d 113, 119 (Tex. 2004). For this reason, Texas courts hold that "a plaintiff in a legal malpractice suit is required to present expert testimony regarding causation and the standard of skill and care ordinarily exercised by an attorney." *Cantu v. Horany*, 195 S.W.3d 867, 873 (Tex. App. 200) (citing *Alexander*, 146 S.W.3d at 119-20). At issue here was a judgment call by Gammon involving the application of a technical area of the law: the state antitrust statute. *Alexander*, 146 S.W.3d at 119-20.

27.      Both parties here retained experts. The Trustee's expert testified that Gammon "[was] negligent in filing a frivolous or groundless pleading on behalf of Champion." Trial Tr. 85:3-5. But he based his opinion that the pleadings were frivolous or groundless on the findings of the state court, asserting they were the law of the case and "beyond contestation by the Gammon defendants." Trial Tr. 85:12-15. Indeed, the Trustee's expert testified that he relied substantially, if not entirely, on what the two state courts found in forming his opinion. Trial Tr. 101:18-25; 102:1. Gammon's expert took a different approach. His opinion did not rely on the

---

[3] The litigation that ensued following the state court petition could not have been known to Gammon when the petition was filed. Thus, this Court cannot fairly impute knowledge of the future outcome of the state court case to Gammon, and that is the fatal flaw in the Trustee's theory of the case.

state court findings, but instead involved his own analysis of the claims, their elements, selected case law, and the state court petition, ultimately concluding that a prudent attorney could have filed the pleadings. Defs.' Ex. 21, at 9.

28.     As discussed above, the proper inquiry is to evaluate what was known or could have been known to Gammon when the lawsuit was filed, not 20-20 hindsight as argued by the Trustee and his expert. By adopting the state court opinion as dispositive on whether the pleadings constituted an act of malpractice, the Trustee's expert failed to provide testimony as to the standard of care or produce an opinion based on what could have or should have been known to Gammon when the state court suit was filed. Because Texas law could be read to require expert testimony on causation and the standard of care in a malpractice case, the Trustee has failed to carry his burden and cannot succeed on a malpractice claim. Although the report prepared by Gammon's attorney contains some limitations, detailed below, the Court is reluctant to second-guess the expert's considered opinion.

**III. Alternative Conclusions**

29.     Both parties concede that Gammon owed a duty of care to Champion as a client. Joint Pre-Trial Order, 10, ECF No. 90. The issues of breach, causation, and damages are contested. *Id.* at 12. For the reasons enumerated below, if a court were willing to substitute its own judgment and look beyond the expert testimony, that court could conclude that filing the state court lawsuit was an act of malpractice. *See ASARCO LLC v. Americas Mining Corp*., 396 Bankr. 278, 434 (S.D. Tex. 2008) (alternative findings offered by trial court to expedite disposition on review).

30.     This Court offers the alternative conclusions discussed below as the way the case *could* – and possibly should – have come out. That said, this Court maintains that the conclusion

above is how the case *should* come out. The alternative conclusions below do not reflect the case that was tried. The Trustee tried the case based on his law of the case theory and held his expert to the same theory. The Trustee should be held to this choice.

## A.  The Pleadings in State Court

31.     As discussed above, Champion's state court petition alleged conspiracy to restrain trade, tortious interference with existing contracts, and tortious interference with prospective relations. Pl.'s Ex. 3.

### 1.  <u>Conspiracy to restrain trade</u>

32.     Champion's restraint of trade allegations invoked the Texas Free Enterprise and Antitrust Act, TEX. BUS. & COMMERCE CODE § 15.05 (a) and (c). Pl.'s Ex. 3, at 8.  The Texas law is modeled on existing federal law; Section 15.05 (a) is the analogue to § 1 of the Sherman Act, and §15.05(c) is the analogue to §3 of the Clayton Act. *Star Tobacco v. Darilek*, 298 F. Supp. 2d 436, 440-41 (E.D. Tex. 2003); *Caller-Times Pub. Co. v. Triad Communications, Inc.*, 826 S.W.2d 576, 580 (Tex. 1992). Accordingly, Texas courts look to federal interpretations of the relevant Acts to inform their interpretation of the Texas Antitrust Act. TEX. BUS. & COMMERCE CODE § 15.04; *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 687 (Tex. 1990).

33.     To assert an antitrust claim, a plaintiff must have standing. *Doctor's Hosp. v. Southeast Medical Alliance*, 123 F.3d 301, 305 (5th Cir. 1997) (requiring showing of injury-in-fact, antitrust injury, and proper plaintiff status). Standing and substantive liability are separate inquiries, yet oftentimes courts conflate the two. *Id*. Indeed, the state appellate court in this case commingled the two concepts, resulting in a confusing discussion. Pl.'s Ex. 23 at 23-24. Because of the muddled distinction between standing and substantive liability, this discussion will focus on the substance of the restraint of trade claims.

34.     For restraint of trade claims under both 15.05(a) and (c) and their federal counterparts, analysis begins by defining the relevant product and geographic markets. *Apani Southwest, Inc. v. Coca-Cola Enters.*, 300 F.3d 620, 625 (5th Cir. 2002). While the relevant markets were not explicitly defined in Champion's pleading, there are inferences to the relevant markets in the Second Amended Complaint. For instance, the complaint uses phrases like "luxurious hospitality industry," "[t]he effect of this condition is to substantially lessen competition in high-end pre-event photography.," and "small market of high-end event photography." Pl.'s Ex. 3, at 4; 9. Phrases like these suggest that the product market at issue was likely wedding photography, and context shows the local Austin geographic market was at issue.[4] Though not pleaded elegantly, the markets at issue could be discerned.

35.     Likely in response to the Trustee's extensive argument about whether the relevant market was pleaded, Gammon argues that he defined (admittedly, imprecisely) a niche market. Dfs.' Post-Trial Br., 9, ECF No. 110. While it's somewhat unclear whether Gammon's definition of the relevant market would pass muster under the detailed tests used by courts, even assuming it did, the restraint of trade claims would fail for the reasons described below. *See, e.g., Apani Southwest*, 300 F.3d at 625-627 (discussing tests to determine relevant product and geographic markets).

36.     Read literally, Section 1 of the Sherman Act (and, by extension, section 15.05 (a) of the Texas Antitrust Act) would bar nearly any commercial contract as a restraint of trade. *U.S. v. Topco Assocs.*, 405 U.S. 596, 606 (1972). Instead, courts find that it bars only those acts that restrain trade unreasonably. *Id.*; *Marlin v. Robertson*, 307 S. W. 418, 427 (Tx. App. 2009). When

---

[4] Counsel for the Trustee expended great effort to attempt to prove Champion pleaded a worldwide market in the state court and that Nichols and Lindberg did not control the worldwide market. But because Nichols and Lindberg controlled neither the Austin market nor the worldwide market, the distinction is irrelevant for our analysis.

assessing whether a restraint is unreasonable, courts typically use the "rule of reason" analysis.[5] *Jayco Sys., Inc. v. Savin Bus. Machs. Corp.*, 777 F.2d 306, 317 (5th Cir. 1985); *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 688, 98 S. Ct. 1355, 1363-65 (1978). Under the rule of reason, courts balance the anticompetitive effects of the practice with the procompetitive benefits to determine whether the "complained-of-actions unreasonably restrained trade" in the relevant market. *Apani Southwest*, 300 F.3d at 627; *Hornsby Oil Co. v. Champion Spark Plug Co.,* 714 F.2d 1384, 1392 (5th Cir. 1983) (must prove actions, on balance, adversely affected competition in relevant market). Generally, a plaintiff cannot succeed by showing an individual injury or elimination of a single competitor. *Marlin*, 307 S.W.3d at 429 (cannot demonstrate unreasonableness of restraint by showing own injury); *In re Mem'l Herman Hosp. Sys.*, 464 S.W.3d 686, 709 (Tex. 2015). The market power of the defendant is crucial to allegations under this section. *Associated Radio Service Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1348 (5th Cir. 1980) (*citing Northwest Power Products, Inc. v. Omark Industries*, 576 F.2d 83 (5th Cir. 1978).

37.     Champion pleaded that Nichols and Lindberg created a "monopoly" on photography at their events and as a result, Champion lost business and competition was lessened. Pl.'s Ex. 3 at 9. Merely pointing to Champion's individual economic injury was likely insufficient to show the unreasonableness of a restraint. *Marlin*, 307 S.W.3d at 429; *In re Mem'l Herman Hosp. Sys.*, 464 S.W.3d at 709. Additionally, Champion could not show that Nichols and Lindberg, two local photographers, exercised market power or controlled the Austin wedding photography market, such that their restraint on trade was unreasonable. *Associated Radio*, 524 F.2d at 1348; *Marlin*, 307 S.W.3d at 429. The testimony at the malpractice trial

---

[5] Some agreements are so innately anticompetitive that courts do not engage in a detailed analysis of the industry. Such agreements are treated as "per se" anticompetitive. *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692, 98 S. Ct. 1355, 1365 (1978). There is no indication this treatment should apply here.

established that Hayes, an active and engaged client with knowledge of market, does not believe that Nichols and Lindberg controlled the market. Trial Tr. 49:18-22. This indicates that, based on his client's knowledge or common sense, Gammon should have known this claim was not viable based on lack of market power. Based on the facts and the pleadings, success on this claim was highly unlikely, if not impossible.

38.     Section 15.05(c) (and §3 of the Clayton Act) allows a claimant to challenge exclusive dealing arrangements that substantially lessens competition. *Star Tobacco*, 298 F. Supp. 2d at 441; *Apani Southwest*, 300 F.3d at 625. To demonstrate a claim, "the Supreme Court has held that a claimant must demonstrate: (1) the relevant product market, (2) the relevant geographic market, and (3) that the competition foreclosed by the arrangement constitutes a substantial share of the relevant market." *Star Tobacco*, 298 F. Supp. 2d at 445 (*citing Tampa Electric Company v. Nashville Coal Company*, 365 U.S. 320, 327-28 (1961)).

39.     Gammon cites *Star Tobacco* for the proposition that the elimination of even a single competitor from the market can be enough to support a claim under 15.05(c). Defs.' Proposed Findings, 10, ECF No. 89. But as *Star Tobacco* points out, a plaintiff must establish that the competition foreclosed by the restraint constitutes a substantial share of the relevant market. *Star Tobacco*, 298 F. Supp. 2d at 444. Champion made no such allegation and, based on Hayes testimony, could not have done so in good faith.[6]

40.     While Gammon's expert, the only expert to analyze the facts known at the time, concluded a reasonably prudent attorney could have filed these claims, that expert failed to address the deficiencies noted above. Defs.' Ex. 21. The Trustee's expert adopted the "law of the

---

[6] The viability of the claim under 15.05(c) is also subject to scrutiny for the reasons stated in Defendants' proposed findings, namely that Nichols and Lindberg were contracting with the bride and groom, who were highly unlikely to hire Hayes, who was typically hired by wedding vendors. Defs.' Proposed Findings, 10-11, ECF 89.

case" approach, and thus did not offer any comparable analysis or testimony about the decision to pursue the claims filed in state court. *See, e.g.*, Trial Tr. 85:12-15.

### 2. **Tortious interference with existing contracts**

41.     The elements of tortious interference with existing contracts are

    (1)     the existence of a valid contract

    (2)     a willful or intentional act of interference with the contract

    (3)     proximate cause, and

    (4)     damages.

*Prudential Ins. Co. of Am. V. Financial Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).

42.     Craig Barker, attorney for Nichols and Lindberg, listed these elements in his May 2014 letter and also cited three cases on which Gammon could rely.[7] *Id.* Tortious interference with existing contracts is subject to the affirmative defense of justification, which is mentioned in the *Butnaru* and *Seelbach* cases, both of which were cited in Barker's letter. Defs.' Ex. 8, at 3-4.; *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 725 (Tex. 2001); *Butnaru.,* 84 S.W.3d at 207; *Seelbach*, 7 S.W.3d at 756-57.

43.     Champion's petition satisfied the elements above by pleading that

    (1)     Hayes had contracts with Abbey Daigle and Townsley Designs,

    (2)     Nichols and Lindberg, respectively, knew of these contracts and intentionally interfered, and

    (3)     both Daigle and Townsley terminated their contracts because of the

---

[7] The cases cited in Barker's letter are *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 207 (Tex. 2002)(applying four factors for tortious interference with existing contracts and noting affirmative defense of justification may defeat liability), *Astoria Indus. V. SNF, Inc.*, 223 S.W.3d 616, 633-34 (Tex. App. 2007)(applying factors for tortious interference with a business relationship), and *Seelbach v. Clubb*, 7 S.W.3d 749, 756-57 (Tex. App. 1999)(applying factors for tortious interference with a contract and noting defense of justification/privilege).

interference…

(4)     causing Hayes damages.

Pl.'s Ex. 3, at 10-11.

44.     While Champion's petition pleaded facts to support the four elements listed above, Gammon failed to anticipate the obvious defense of justification. "Under the defense of legal justification or excuse, one is privileged to interfere with another's contract (1) if it is done in a bona fide exercise of his own rights, or (2) if he has an equal or superior right in the subject matter to that of the other party." *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 691 (Tex. 1989). In their state court motion for summary judgment, Nichols and Lindberg argued they were justified in any interference based on their own contracts. Pl.'s Ex. 5, at 24. In response, Champion merely returned to its failed restraint of trade theory, arguing that Nichols and Lindberg had not established a justification defense because their contracts illegally restrained trade. Pl.'s Ex. 6, at 11. Gammon's expert rendered his opinion based on the pleadings alone without addressing whether a reasonably prudent attorney would have filed the claim when faced with this obvious affirmative defense. Defs.' Ex. 21. No relevant testimony from the Trustee's expert was provided.

### 3.   <u>Tortious interference with prospective relations</u>

45.     The elements of tortious interference with prospective relations are

(1)     a reasonable probability that the plaintiff would have entered into a business relationship with a third party,

(2)     the defendant either acted with intention to interfere or knew that interference was substantially certain to occur as a result,

(3)     the defendant's conduct was independently tortious,

(4)     proximate cause, and

(5)     actual damages.

*Coinmach Corp. v. Aspenwood Apt. Corp.*, 417 S.W.3d 909, 923 (Tex. 2013) (citations omitted).

46.     Champion's petition attempted to satisfy these elements by pleading that

(1)     Hayes had ongoing relationships with event planners and vendors that hired him and that there was a "reasonable probability Hayes [] would have entered into a business relationship with vendors."

(2)     Nichols and Lindberg intentionally interfered with Hayes' ongoing business relationships.

(3)      "Defendants' restraint of trade and expansion of their exclusivity contracts to include pre-event vendor photography is and was independently tortious and illegal"

(4)      "Defendants' interference proximately caused injury to Hayes…

(5)      …which resulted in the damages of loss of contracts and resulting revenue."

Pl.'s Ex. 3, at 12.

47.     Gammon's expert concluded that Champion's petition correctly recited the elements of this cause of action, and the lack of detail in the pleading could have been corrected though special exceptions. Defs.' Ex. 21, at 10; Trial Tr. 123:3-12 (adopting proffer as direct testimony). What he failed to address, however, was that Champion relied on its doomed restraint of trade argument to satisfy the "independently tortious" element of the claim, making this claim dependent on the success of the restraint of trade claim. Furthermore, the defense of justification was not addressed. As before, the Trustee's expert did not provide any relevant

testimony other than to adopt the "law of the case."

48.    Based on the analysis above, a court that chose to look beyond the expert testimony provided and independently assess the claims as pleaded in the state court based on the information known at the time might conclude that these claims had no chance of success, and thus filing the petition was an act of malpractice.

### B. Causation

49.    In awarding Nichols and Lindberg their attorney's fees of $41,518.75, the state trial court made the following finding in its sanctions order:

> "Sanctions are also appropriate against Plaintiff under Chapter 10 and Rule 13 because Plaintiff knew or should have known that it was groundless to assert in the above pleadings and motion that Defendants, two local photographers, control worldwide high-end wedding industry about which he pled and because his pronouncements online about the lawsuit are evidence that he authorized the lawsuit and the above pleadings and motion in bad faith and for the improper purpose of discrediting Defendants to gain a competitive advantage over them."

Pl.'s Ex. 15, at 2.

50.    The Trustee's expert report, in relying on the sanctions order, offers no evidence as to cause. Pl.'s Ex. 32. At trial his expert merely testified that "Champion suffered damages as a result of the imposition of monetary sanctions against it, as well as the attorneys' fees that it paid to the Gammon defendants for prosecuting the frivolous or groundless lawsuit." Trial Tr. 85:15-19. Gammon's expert also referenced the trial court's sanctions order and concluded that if a breach occurred, the breach was not the proximate cause of damages, citing the trial court's imposition of sanctions on Champion alone and its reliance on Hayes' Facebook posts in its findings. Defs.' Ex. 21, at 11.

51.    Gammon also argues in post-trial briefing that causation cannot be established because the result was not foreseeable. Defs.' Post-Trial Br., 12-13, ECF No. 110. He points to

events in the procedural history of the state court case, such as Nichols' and Lindberg's failure to use special exceptions, Hayes' defamatory Facebook statement, and alleged errors in the trial and appellate courts, to establish that the sanctions award was not foreseeable. *Id*. Yet as Gammon argued, foreseeability is an aspect of proximate cause, and causation required expert testimony. Defs.' Post-Trial Br., 3;11, ECF No. 110. Gammon's expert opined that Hayes' Facebook posts were the proximate cause of the sanctions award but did not address the other events recited in the post-trial briefing with respect to proximate cause or foreseeability. Defs.' Ex. 21, at 3.

52.      Given this lack of expert testimony in support of causation, this Court finds that the Trustee has failed to carry their burden on the malpractice claim. But given the clear defects that infected all four claims pleaded by Champion, it seems inevitable that Nichols and Lindberg would seek dismissal and damages. If a Court were willing to substitute its own judgment for that of Gammon's expert, it could conclude that causation exists here.

### C.  Damages

53.      If a Court found that the Trustee carried his burden on duty, breach, and causation, then the estate (on behalf of Champion) would be entitled to any damages incurred. The Trustee seeks to recover the sanctioned amount of $41,518.75, representing legal fees incurred by Nichols and Lindberg in defending the state court suit. Pl.'s Proposed findings, 16, ECF No. 91. The Trustee also seeks to recover fees of at least $31,166.37 collected by Defendants to pursue the lawsuit through the appeal. *Id*.

54.      The sanctioned amount would be recoverable, but the amount of fees to be recovered requires more inquiry. That is because the Gammon Defendants would have a right to retain fees collected up until the point at which a reasonable attorney would have realized that their investigation revealed no viable claims and stopped pursuing the suit. While neither expert

provided testimony on this issue, a determination might be made by looking at the attorney billing records. *See* Defs.' Ex. 12. On May 15, 2014, Gammon's associate, Read, billed an hour of time researching defenses to interference, at which time a reasonable attorney would have concluded that Nichols and Lindberg could assert the defense of justification to claims of tortious interference and those claims would not succeed. *Id.* at 1.

55.     On May 19, 2014, Read billed two hours of time researching unfair competition. Based on this initial research, a reasonable attorney would have quickly determined that, given the facts here, namely that Hayes was a single competitor feuding with two photographers in a major metropolitan market, a claim of unfair competition based on an antitrust statute could not be sustained. *Id.* at 2. Time billed before May 19 would be compensable because a reasonable attorney might have incurred those fees in investigating the client's case before concluding that the claims could not be sustained. Time billed following May 19 would not be compensable because pursuing the lawsuit after that point was not reasonable, and thus the Gammon Defendants would need to return those fees to Champion. Thus, the Gammon Defendants may retain the $4,501.00 billed up to and including May 19. Defs.' Ex. 12, at 1-2. The Trustee sought to recover $31,166.37, the amount of fees collected for pursuing Champion's affirmative claims. Pl.'s Proposed Findings, 17, ECF No. 90. Thus, the amount the Trustee might recover would be the sanctions award of $41,518.75 plus $31,166.37 in fees, less the $4,501.00 in fees incurred up to and including May 19, for a total of $68,184.12.

56.     Gammon argues that, once creditors have been paid, there is no reason for the Trustee to pursue a malpractice claim "for the benefit of the debtor's owners who did not wish to pursue the claim in the first place." Defs.' Post-Trial Br., 2-3, ECF No. 110. But, Gammon cites no law to support this proposition and the Court finds the argument unpersuasive for three

reasons. First, the creditors have not been paid. Nichols and Lindberg still have outstanding proofs of claim for the amount of the sanctions award. Second, and even if Nichols and Lindberg had been paid, the Trustee could recover his costs of administration by pursuing the claim.[8] Finally, the Trustee, and not Champion's owners, has the right to pursue the claim. *See generally*, 11 U.S.C. §§ 323; 704. Indeed, a "trustee has a fiduciary duty to maximize the value of the estate." *In re Bechuck*, 472 B.R. 371, 377 (Bankr. S.D. Tex. 2012) (citing 11 U.S.C. § 704(a); *In re Johnson*, 433 B.R. 626, 638 (S.D. Tex. 2010)). The Trustee has discretion in exercising his statutory and fiduciary duties, including using his "reasonable business judgment in deciding what actions to bring…". *In re Cooper*, 405 B.R. 801, 812 (Bankr. N.D. Tex 2009). The Court will not second-guess the Trustee's business judgment here.

57.      Next, Gammon argues that without the support of Hayes, the client, the estate cannot establish a malpractice claim. Defs.' Post-Trial Br., 7, ECF No. 110. Gammon relies on *In re Segerstrom* to support his theory. 247 F.3d 218 (5th Cir. 2001). In *Segerstrom*, the Chapter 7 trustee brought a malpractice action on behalf of the estate based on prepetition representation of the debtor that led to a judgment against the debtor of $8.5 million dollars. *Id.* at 221. After the malpractice suit was filed, the debtor signed an affidavit stating that she was happy with the firm's work in the state court. *Id.* at 222. The Fifth Circuit found that the debtor's postpetition conduct did not affect whether a malpractice claim was part of her bankruptcy estate because she "never denied or waived that malpractice action *prior to the commencement of her bankruptcy*." *Id.* at 224 (emphasis in original). But the Court found that her affidavit did prevent the estate from meeting its burden on causation because there was "no evidence that Segerstrom did not

---

[8] Furthermore, precedent suggests that the Trustee may recover the whole value of the suit, even when the claims are less than that amount. *Crescent Res. Litig. Trust. V. Duke Energy Corp.*, 500 B.R. 464, 480 (Bankr. W.D. Tex. 2013)(Fifth Circuit rule allows the trustee to recover the full value of an avoided transfer even when the claims were nominal in the section 544(b) context).

receive the precise goal she sought in the [] litigation." *Id.* at 226. This finding was mainly premised on the fact that, by strategically accepting liability for the accident at issue, Segerstrom protected her overarching interests by diverting liability from her parents' company, which would have damaged her far more than personal liability. *Id.*

58.     As the Trustee points out, the facts of *Segerstrom* are distinct from the facts here. Pl.'s Post-Trial Reply, 8-12, ECF No. 111. First, while Hayes testified at trial that he never consulted an attorney about a potential malpractice suit before bankruptcy, was indifferent to the Trustee's decision to sue Gammon, and did not endorse the Trustee's theories, he did not deny or waive the malpractice action, and certainly did not do so prepetition. Trial Tr. 52:13-17; 59:5-14. Moreover, the debtor in *Segerstrom* had competing interests because, as a teenager, she still relied on her parents for financial support and didn't have any unencumbered assets. 247 F.3d at 226. For that reason, directing liability to herself and away from her parents and their company benefitted her. *Id*. No such facts exist here. Thus, Hayes' indifference to the malpractice suit does not prevent the Trustee from recovering on behalf of Champion's estate.

59.     Finally, Gammon argues that there is no basis to impute personal liability to him personally for the work of his associate, Tony Read, unless he committed an independent act of malpractice. Defs. Post-Trial Br., 11, ECF No. 110. While the Trustee asserted failure to supervise in his First Amended Complaint, Gammon argues that, because the expert report did not address the new theory and thus the expert could not discuss the theory at trial, there is no ground on which to hold Gammon liable. *Id*. At trial, Gammon testified that he was "responsible for the pleadings that came out of the law office at that time" and that "ultimately, the buck stops here." Trial Tr. 69:16-19. Through this statement, Gammon obviated any deficiencies in the Trustee's pleadings or exhibits by accepting personal responsibility for filing the lawsuit.

24

60.     The Trustee requests both actual and punitive damages. By his own admission, the Trustee must prove that Gammon acted with either malice or gross negligence by clear and convincing evidence. Pl.'s Post-Trial Br., 6, ECF No. 106; *See also* Tex. Civ. Prac. & Rem. Code §41.003. "Malice' means a specific intent by the defendant to cause substantial injury or harm to the claimant." Tex. Civ. Prac. & Rem. Code §41.001(7). (11)

61.     "Gross negligence' means an act or omission:

(A)  which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(B)  of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others."

Tex. Civ. Prac. & Rem. Code §41.001(11).

62.     By relying heavily on the sanctions order in the state court, the Trustee has failed to produce evidence sufficient to produce a finding of malice or gross negligence. Pl.'s Post-Trial Reply, 10-11, ECF No. 111. There was limited, if any, testimony at trial about Gammon's state of mind and Hayes testified that Gammon "certainly did not ever intentionally try to harm [Champion] or me personally." Defs.' Ex. 23, at 3; Trial Tr. 99:4-9. For this reason, the trustee has failed to carry his burden as to punitive damages.

**Conclusion**

63.     The Trustee's expert—constrained by the Trustee's incorrect law of the case theory—failed to analyze Gammon's decision to file the lawsuit based on what he knew when he

filed the suit. As a result, the expert opinion fails to discuss the standard of care and causation using the proper analytical framework, both of which are needed to establish malpractice under Texas law. The Trustee has thus failed to meet his burden of proof.

64.     But if the District Court is inclined to look beyond the expert opinions and simply apply the law of restraint of trade to the facts known or reasonably available to Gammon when he decided to file the lawsuit against Lindberg and Nichols, the District Court could find that Gammon committed malpractice. The evidence could support a finding that Gammon committed malpractice by filing the suit because he knew or should have known that he could not prove that Lindberg, Nichols, or both controlled an appreciable share of the Austin wedding photography market. Because this defect was so obvious, it seems inevitable that the suit would fail and that Lindberg and Nichols would seek and recover sanctions.

65.     This Court believes the Trustee must be held to his law of the case theory and so adopts and recommends the conclusion in paragraph 62.